# PATTERSON, ASSIGNEE, v. LEE-CLARKE-ANDREESEN HARDWARE COMPANY.

### Fraud, Presumption of — Chattel Mortgage — Assignment for the Benefit of Creditors.

1. The law will not impute fraud to any party when the facts and circumstances out of which it is supposed to arise may well consist with honesty and purity of intention.

2. Where there is sufficient evidence, if believed, to rebut any presumption of fraud, a judgment will not be reversed which upholds a chattel mortgage against a charge that it was made in fraud of the assignment laws.

3. The testimony in this case reviewed at length, and *Held* to show that if the mortgagor in a chattel mortgage in question had contemplated making a general assignment for the benefit of creditors prior to the execution of the mortgage, he had fully abandoned the idea before giving the mortgage, so that the mortgage was not made or received in violation of the assignment statutes.

[Decided April 19, 1898. Commenced in district court April 10, 1897.]

Error to the District Court for Converse County. Hon. Charles W. Bramel, Judge of the Second District, presiding.

The case is fully stated in the opinion.

*Charles F. Maurer*, for plaintiff in error. (*Chester B. Bradley*, of counsel.)

Both by our statute, and the decisions of courts, the mortgagor was insolvent when the mortgage was given; as he was in embarrassed and failing circumstances, and unable to pay his debts from his own means as they became due. (L. 1890, Ch. 51, Sec. 1; Burrill on Assignments, pp. 98, 99; De Ruyter v. Trustees, 3 N. Y., 238; Curtis v. Leavitt, 15 id., 200; Leitch v. Hollister, 4 id., 215; Herrick v. Borst, 4 Hill, 650; Toff v. Martin, 13 Wall., 40; Sacre v. Lobree, 23 Pac. 1088;

26

Wager v. Hall, 16 Wall., 599; Washburn v. Huntington, 21 Pac., 305; Bell v. Ellis, 33 Cal., 620.) Whether defendant, the mortgagee, knew of Hubbard's insolvency or not, as the transfer was out of the usual course of the mortgagor's business, defendant was required to investigate, and if it had done so, the information would have disclosed insolvency. (Ohleoyer v. Bunce, 4 Pac., 549; Godfrey v. Miller, 22 Pac., 290; Chavalier v. Commins, 39 id., 929.) Actual fraud is not necessarily involved. Legal fraud will render it void as against the insolvent laws. (Mathews v. Chaboya, 44 Pac., 169; Tapscott v. Lyon, 37 id., 225; Schlitz v. Childs, 68 N. W., 65; McCandlen v. Hazen, 67 id., 256; 49 Pac., 723; 38 Atl. 940.)

*F. H. Harvey*, for defendant in error.

That the petition does not state a cause of action may be raised for the first time in the appellate court. (Parker v. Bond, 5 Mont., 1; Caldwell v. Ruddy, 2 Idaho, 5; Holt v. Pearson, 12 Utah, 63; Taylor v. Johnson, 113 Ind., 164.) An assignee for the benefit of creditors at common law can not institute suit to set aside a fraudulent transfer made by the debtor prior to the assignment, and under statutes authorizing him to do so, he is given such right only as the representative of the creditors. He can not then succeed unless the creditors could. The petition is based upon constructive fraud only. At common law the creditors could not sue to set aside such a transfer. A transfer, fraudulent in fact, may be set aside pursuant to Sec. 15 of the assignment law, but the petition does not charge fraud in fact. Moreover, under Sec. 15, the court or judge must be satisfied by affidavit of the fraud before action is brought, and this must be alleged in the petition. (Seibert v. Milligan, 110 Ind., 106.) Under Sec. 27 a cause of action is not stated, because it does not appear that the property came into the possession of the defendant. A petition by an assignee to recover assigned property is bad on demurrer if it does not contain

a copy of the deed of assignment.  ( 82 Ind., 61; 65 id., 234; 60 id., 235; 101 id., 486.)   The petition does not allege the "indexing" of the assignment.   The authority of the assignee is derived from the statute.  ( 42 Pac., 50 ( Colo.).)   An assignment of error is abandoned if not referred to in appellant's brief.  ( Syndicate Imp. Co. v. Bradley, 43 Pac., 79.)   "Objected to" is not a sufficient exception;  the grounds must be given.  ( 46 Pac.,  879; 8 S. W., 210.)   In order that the chattel mortgage should have been given " in fraud of the insolvent laws of this State," it must have been executed by the mortgagor with a specific intention in his mind at that time of subsequently making a general assignment for the benefit of the rest of his creditors.   His deliberate and conscious purpose must have been to secure the defendant in full, and afterward assign the rest of his property for the benefit of the rest of his creditors.  ( Hayden v. Allyn, 55 Conn., 280; Simmons Hardware Co. v. Hauf. man, 8 S. W., 284; Abbott v. Shepard, 142 Mass., 17.)

Knight, Justice.

On the twenty-second day of January, 1897, Phares C. Hubbard, who was at that time, and had been for several years prior thereto, the owner of and operating a merchandise (hardware) store, in Glenrock, Converse County, Wyoming, made an assignment for the benefit of his creditors to plaintiff J. F. Patterson, who, as such assignee, brought an action in the district court for said Converse County, on April 10, 1897, against defendant, the Lee-Clarke-Andreesen Hardware Company, a corporation organized and existing under the laws of the State of Nebraska, and in his petition said plaintiff alleged in substance :

First, That on the 19th day of January, 1897, said Phares C. Hubbard made and delivered a certain chattel mortgage for $435.82, upon his certain stock of hardware, to defendant, the Lee-Clarke-Andreesen Hardware Company, to secure the payment of said sum, a copy of

said mortgage being attached to said petition and made a part thereof.

Second, That within twenty days subsequent to the making and delivery of said mortgage, said Phares C. Hubbard made a general assignment, according to law, of all his property not exempt by law to plaintiff Patterson, which assignment included the goods and merchandise covered by said chattel mortgage, and that such assignment was recorded in the manner and within the time required by law.

Third, That said Patterson as such assignee filed his bond, made oath, filed copy of inventory and appraisement, as required by law. Total value of property was appraised at $1,157.88, including property claimed by assignor as exempt under the law, being lots 9 and 10 in block 15, in said Glenrock, appraised at $725, and goods, chattels, and personal property appraised at $300. Then follows a list of such goods, chattels, and personal property, with a certificate of appraisers, setting the same aside to assignor Hubbard; then continuing in the following language:

"Petitioner avers that said Phares C. Hubbard, assignor, was, on January 19, A. D. 1897, and had been continuously for more than six months prior thereto, in embarrassed and failing circumstances, and insolvent and unable to pay his debts from his own means as they became due; that said sum so aforesaid secured by said chattel mortgage was an old account that had been incurred and had accrued and been due and payable for more than one year prior to the execution and delivery of said chattel mortgage; that said mortgagee, at the time of taking said mortgage, was well aware of said failing, embarrassed, and insolvent condition of said Phares C. Hubbard; and were well aware that said Phares C. Hubbard at and before said time of giving said chattel mortgage, was unable to pay his debts, and contemplated making an assignment of his said property for the benefit of all his creditors."

"Petitioner avers that said mortgagee hereinbefore mentioned well knowing the failing, embarrassed, and insolvent circumstances and condition of said Phares C. Hubbard, assignor aforesaid, and having reasonable cause to believe that said Phares C. Hubbard was insolvent, and with a view of fraudulently obtaining a preference of its said claim and account over other creditors, persuaded said Phares C. Hubbard to execute and deliver unto said mortgagee the said mortgage aforesaid for the express purpose of giving said mortgagee a prior lien upon said property, contrary to the laws of the State of Wyoming; that the said Phares C. Hubbard thereupon made and executed said chattel mortgage as hereinbefore stated, and delivered the same to said mortgagee with a view solely of giving said mortgagee a preference over other creditors of Phares C. Hubbard, which said mortgagee was then and there well aware of the same. That said state of insolvency continued up to and including the 22d day of January, A. D. 1897, at which time said assignment was made and recorded."

"Petitioner avers that the total actual value of the said property assigned, including the said property claimed as exempt by said assignor, is appraised at $617.71, which petitioner avers and believes is all the property belonging to assignor, not exempt by law, including real estate, personal property, accounts, and credits and stock. That petitioner has not delivered the said property claimed as exempt to said assignor.

"Petitioner, therefore, prays the court for an order declaring the said chattel mortgage aforesaid and described in Exhibit A null and void, and in fraud of the provisions of Chapter 51, Session Laws of Wyoming, A. D. 1890; petitioner further prays for an order for the delivery of said property claimed by assignor as exempt property, and enumerated in subdivision 3, of this application, to said assignor, and for such other and further order as is meet in the premises."

To the above petition both said Patterson as assignee, and said Hubbard as assignor, separately make oath; and to said petition defendant answered as follows :

" Comes now the defendant and in answer to the petition herein filed :

" Denies that Phares C. Hubbard was at the time of the execution of the mortgage referred to in the petition insolvent, or that he contemplated insolvency. Denies that the said Phares C. Hubbard executed said mortgage with a view of giving a preference to defendant. Denies that defendant at the time of the delivery of said mortgage knew or had reasonable cause to believe that said Phares C. Hubbard was insolvent, or that said mortgage was made in fraud of the provisions of the assignment law, or of any law of Wyoming."

Upon the issue so joined trial was had before the court, a jury having been waived, and the court found and gave judgment for the defendant for costs; and the necessary subsequent proceedings were had, and the case brought to this court upon proceedings in error.

An examination of the motion for a new trial and plaintiff's brief would warrant the conclusion that he relies not only upon the claim that the judgment was against the weight of evidence showing positive fraud, or fraud in fact; but that owing to the time the mortgage complained of was executed, being within the twenty days next before the assignment was made, and to the fact that the defendant had received notice that such assignor prior to the time of the giving of the mortgage contemplated making an assignment for the benefit of his creditors being insolvent, plaintiff was entitled to a judgment under the provisions of Section 27, Chapter 51, Session Laws, 1890, which are as follows :

" If any person being insolvent, or who contemplated insolvency, within twenty days next before making an assignment for the benefit of creditors, with a view of giving preference to any creditor, or any person having a claim against him, or who is under any liability for him, procures or secures any part of his property to be attached, sequestered, or seized on execution, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his property either directly or indi-

rectly, absolutely or conditionally, the person receiving such payment, pledge, assignment, transfer, or conveyance of any part of his property, or to be benefited thereby, or by such attachment, having reasonable cause to believe such person is insolvent, and that such attachment, payment, pledge, assignment, or conveyance is made in fraud of the provisions of this act, the same shall be void, and the assignee may recover the property or the value of it from the person so receiving it, or so to be benefited."

The facts as shown by the record are substantially as follows :  Assignor Phares C. Hubbard, who had business at the place as before described, early in January, 1897, made an inventory of his stock on hand, and in the language of witness Hubbard,  "After I took the invoice, I wrote to his firm (defendant) with all the rest, and gave them the account of the invoice, and told them that I was willing to turn it over and assign to my creditors the whole thing.  I saw that there was not enough to pay them all; for that reason I could not do it."

Subsequently, and it would appear from the evidence after having had the information last above referred to, J. W. Carson, traveling salesman, and whose name appears on the letterheads of defendant as a manager, wrote to assignor Hubbard, "There is a man here who wants to buy a hardware stock.  I have told him about your place, and he is anxious to go out to Glenrock and buy you out."  * * *  "This arrangement will leave you money enough (if it goes through, and I have no doubt it will) to pay off all that you owe, and a balance to commence over again with, which would be much better than borrowing money and mortgaging your property.  I trust you have not mortgaged anything since I saw you, as the party who is coming out with me has a dread of buying mortgaged property."  * * *  After the receipt of said letter by Hubbard, Carson appeared at Glenrock, and what occurred there becomes important, and in Hubbard's evidence is described as follows:

A. The first conversation I think I came from the post office, or somewhere around there; he was there when I came in. The first I asked him where the gentleman was who was going to buy out the property. He said he met with an accident down the road, that a team run away with him and threw him out of the buggy, broke an arm and three ribs, and I believe a leg — I won't be positive about the leg business; and his wife was in with him and was not hurt much. I told him I was very sorry of it because I expected to sell; it would be much better than to mortgage and borrow money. Then he asked me how we were going to fix up our business that I owed the firm. I told him I did n't know, I had no money; that I had written to all the hardware firms I owed in regard to making an assignment, that I was perfectly willing to do it if they preferred it, and that it was my desire to do it. I told him that I had not heard from any of them as yet at that time, I was waiting for an answer. He wanted me to give him goods out of the store for the debt. I told him that I could not, did n't feel disposed to do that, to give one creditor the preference; that I would rather turn it all over; I did n't see any way of getting the money; the times were hard and I could n't sell nothing, and my dependence was entirely on what I sold there; that I had nothing outside. I think there was something said that night about a mortgage; I would not be positive whether there was anything said that night or not about the mortgage, or the next day; I would not be certain whether it was broached that night or not.

Q. Did Mr. Carson read a letter to you that night? A. Yes; in the meantime he read me a part of a letter which purported to come from the firm, which I have no doubt but it did that they got my letter; and I told him that I had written to them to that effect; I sent them an invoice. I was waiting for an answer what to do; that I was willing to make an assignment, or turn the goods over to my creditors if they wished it; it was my desire. He read me a part of the letter.

Q. What did he read to you? A. That they had better come up and fix it up in some shape. I don't recollect the exact words, but that was the purport of it.

Q. Was anything further said that night? A. Nothing that I remember now that relates to the case whatever.

Q. What conversation did you have with him the next day? A. The next day he came down in the morning, and wanted to know how I was going to fix up. I said I didn't know; that I preferred and wanted to turn all the goods over to my creditors, that was my idea and what I wanted, because I was satisfied I couldn't get the money out of them for some little time. I had letters from some of them that they were going to send sight drafts, and I didn't see no way out of it whatever. I had no money, and I couldn't pay it. I made up my mind I would make an assignment, and turn the goods over to all my creditors.

Q. Did you tell all this to Carson that you have just stated? A. That morning I don't think I did; but I told him that I wanted to turn over my goods to my creditors. I told him that, I think, two or three different times in that conversation in the night and day.

Q. State as nearly as you can the conversation the next day. A. Then he wanted me to let him have the goods. I told him that I could not see how I could do that very well because it would take the best of the goods out of the outfit, and I wouldn't be able to sell anything; and I wouldn't do that; then he wanted me to give him a mortgage on it. I didn't want to do that. I held off; I didn't like to do that until I heard from the other people to see what they wanted to do. I understood that it was to run a year. Finally I told him to let it run a year, I would let him have a mortgage on the hardware. I thought that if the times picked up I could pay all in full; I knew there was enough to pay all in full as it was. The mortgage was written out with that understanding; the mortgage was written different afterwards. He put in everything there was. I didn't suppose that they would

jump on to anything; it was written out, and I let it go that way, did n't say nothing.

Q. You may state whether or not that mortgage covered all of your property except your homestead.  A. It did everything I had, even the furniture in the store.

Q. Fixtures and everything?  A. Yes, sir.

Q. With the exception of your homestead and a few book accounts, everything else was covered by this mortgage?  A. Yes, sir.

Q. State whether or not you had any conversation with Mr. Carson on that subject; that nothing was left out. A. I don't know that anything was said direct, I can't say that; I don't know that there was anything said about the book accounts; there was probably not much, a hundred dollars of book accounts.  He asked if I had any stoves, and I told him no, I did not, except what was in use in the house.

Q. State whether or not this mortgage was given for the purpose of giving the preference to the Lee-Clarke-Andreesen Hardware Company over your other creditors. A. I don't suppose it could be construed any other way.

Cross-examination by Mr. Harvey:

Q. Is it not a fact, Mr. Hubbard, that in that conversation you first volunteered to turn over some of these goods to this firm represented by Mr. Carson?  A. No, I did n't volunteer; it was the time before that conversation was I went on the cars from Glenrock to Douglas; we were talking.  He wanted to know if I would turn over the goods to them for the amount; I told him that perhaps I would when another time he came up.  I thought then I would.  That was before I took the invoice. After I took the invoice, I wrote to his firm, with all the rest, and gave them the amount of the invoice, and told them that I was willing to turn it over and assign to my creditors the whole thing.  I saw that there was not enough to pay them all; for that reason I could not do it; that was the time he was up there.

Q. Is it not a fact that was just prior to the receipt of this letter by you?  A. That letter I received after I sent them the notification of the invoice and what I wished to do.  They wrote to him, I suppose; he got that letter I speak of before he wrote this letter.

Q. He wrote this letter after you had this talk with him on the cars?  A. Yes, sir, because he had the letter in his pocket at the time which referred to it.

Q. Now, did n't you in some of those conversations say something to him about borrowing some money; that you thought you could borrow some money?  A. I told him that I would try, and I did try to borrow money to settle up; and I was willing to mortgage my whole property to get money to settle up these bills; I tried to do it, and I could n't borrow it.

Q. Did you not state on the 18th and 19th, at the time that this mortgage was executed, that you expected to borrow two thousand dollars from a sheep man, and if he would give you a little time on the mortgage, you could take it up?  A. A man promised to loan me money after sheep shearing; there was nothing certain about that; I told him that; there was another man promised to let me have some money, but he did n't; that was uncertain, I told him that.

Q. Is it not a fact that at the time this mortgage was executed that you thought it very likely you could borrow some money from a sheep man?  A. I thought perhaps if the times changed, I could pay all my creditors; but I found I could not do it by May first.  It was to run a year; it was put in afterwards May first; that gave me to understand that was the time I was to pay it; and I knew at once I could n't pay it.  That was the reason of the assignment right there and then.

Defendant produced evidence as to the same transaction, witness J. C. Carson testifying as follows:

"A. Mr. Hubbard had several times asked me to hunt up a buyer, some one who would buy out his stock.  I was coming up to Glenrock on my regular trip in Jan-

uary, about the 17th, 18th, or 19th of January. I saw Mr. Hubbard and asked him how he wanted to fix up his account; it was time something was done with it, and our house was anxious to close up the account on the books, as it was New Year and they wanted to close up '96 business. He said he was anxious to do so. I asked him how he wanted to fix it up. I told him we were willing to do anything he wanted us to do; if he would make a reasonable proposition, I would acquiesce to it. He talked around quite a bit, he and Mrs. Hubbard, and told me he expected to get money in the near future from some sheep man that he expected to borrow a couple of thousand dollars from; also that he expected to get the appointment of postmaster at Glenrock; that with this money that he expected to get he could pay out what he owed in a short time. He said he had goods enough; his inventory run less than one hundred dollars of his entire indebtedness; that is, without his book accounts. He had almost merchandise enough to pay his entire indebtedness, according to his statement. He said he would give goods for the amount of my claim if I preferred it. I told him of course if he wished to do it, that I would accept the goods, but I thought if he could borrow this money as he said he could, it would be better to fix it up that way and turn himself around; he could make more out of the goods than I could. He said to come in the morning; I went in the morning; he said he thought it would be better if I could give him time; he thought it would be better to give us a mortgage, and have us wait until he got this money; I told him all right, I would do that; that it would suit me better than to take the old goods and ship them out of town, so I drew up the mortgage and he signed it.

Q. State what conversation was had as to giving him time for the payment of this. A. He told me that he could have all the time he wanted to pay this mortgage to pay the money.

Q. Was there anything said about giving a year's time? A. There was no particular time stated; I told

him that he could have all the time he wanted, that we wanted to help him all we could; he had traded with us six or seven years; we had always carried him along more or less ever since he commenced to trade; we always felt very friendly to him. I told him that we would give him all the time he wanted to get out of the hole. He said he could do that all right from the salary he had from the post office, and looking after the hardware business he would have no trouble in paying up.

Q. What do you mean by paying up? A. Paying the whole business according to his statement; he was only short fifty dollars to cover the whole business. Q. State whether or not in this conversation, he constantly insisted that he could work out and pay all his debts. A. He did speak of it several times, asked if the house would send him goods in the meantime. I told him that we would send a reasonable amount. He never implied directly or indirectly that he was going to make an assignment.

Q. Explain to the court how the date in your mortgage was inserted.

A. In writing out the mortgage I made the mortgage before I made the note. I wrote in the mortgage; there is a place in the mortgage when the note becomes due; that was left; I handed it to the old gentleman, and he read it. He said, You have left that blank due. I said, All right I will put that in there; but it will cut no figure in collecting the mortgage; we made the note March 1, and filled the line in the mortgage. Q. It was distinctly understood that notwithstanding that date March 1, you were to give him all the time he wanted. A. Yes, sir. Q. It was distinctly understood that the purpose of the execution of that mortgage was for him to work out and pay all his debts. A. Yes, that is the way we understood it; he and his wife thought they could come out in a short time with the prospects they had in view with the prospects of borrowing money, and the receipts of the post office would very easily pay them out.

Q. Did Mr. Hubbard, at any time during that conversation, state to you or throw out any intimation that led you to believe that he had in mind at that moment, a purpose subsequently, and within twenty days, of making a general assignment for the benefit of all his creditors? A. No, sir, he did not intimate in any way, or speak of an assignment in any part of our conversation, or use the term assignment; it was at no time during the two conversations we had in the evening and the next day. Q. Did you during those conversations on the two days mentioned contemporaneous with the execution of this chattel mortgage receive information from any source which led you to believe that Mr. Hubbard had in mind at that time a purpose to subsequently, and within ten days therefrom, make a general assignment for the benefit of his creditors? A. No, sir.

Q. Now, Mr. Carson, you may state to the court what conversation you had with Mr. Hubbard at that time with relation to his solvency, the kind of property he had as compared with the amount of indebtedness he owed. A. He showed me an invoice book he had just completed; I can not recollect the exact figures just now; but it was nine hundred and some odd dollars was his invoice of his merchandise; and he told me that his indebtedness, what he owed Lee, Clarke, and three or four others, was a little over a thousand dollars; and that is all the conversation we had about his solvency at the time, or at any other time. I asked him if his book accounts were in that, and he said no, he had his book accounts outside of that.

Q. Did he name how much was on these book accounts? A. He did not. Q. Did you at that time believe Mr. Hubbard to be insolvent as you understand that commercial term? A. I did not. Q. Now, Mr. Carson, state how long you have been in the hardware business in this portion of the country? A. Ten years, this year, the first of this year, since I came up here; I have been here continually ever since. Q. State whether you are familiar with the customs of business men in this

region? A. I am, yes, sir. Q. You may state whether or not the mere fact that a man is unable to pay in cash his entire indebtedness at a given time is considered as showing that he is insolvent.

Q. State whether or not it was the understanding, at the time this mortgage was executed between you and Mr. Hubbard, that he should go on in business, and with what assistance your firm could render him in the way of credit, work out and pay all his creditors. A. It was expressly understood that way."

We give the foregoing to show some of the facts presented before the trial court, not all, by any means; for it is admitted that the inventory described by witness Hubbard· showed value nearly equal to the claimed indebtedness, independent of the book account, which instead of a hundred dollars the record shows was $334.84.

It became necessary for the trial court to determine the " object or view " that induced Hubbard to execute this mortgage; and further, whether or not the defendant had reasonable cause to believe Hubbard was insolvent, and was making said mortgage in fraud of the provisions of our assignment laws. Sufficient of the record has been here referred to that shows the evidence was conflicting. We can not say that the findings and judgment is not supported by the evidence. That depends very much upon where the truth lies. There was sufficient evidence, if believed, to rebut any presumption of fraud. The law does not allow us to impute fraud to any party when the facts and circumstances out of which it is supposed to arise may well consist with honesty and purity of intention. As is said by Bigelow on Fraud, ed. 1877, preface pp. 4, 5, " The law here to be applied is statutory law, and as to the statutory law concerning fraud on creditors and purchasers, each State of the Union, with few exceptions, has a code of its own interpreted by independent tribunals, and enforced by distinct and diverse penalties and procedure. With deference to the views of others who have

attempted to present a harmonious view of the statutes of the different States, the author is satisfied that such efforts are both unsatisfactory and dangerous. The decisions of the courts of New York concerning the interpretation of an ambiguous statute of that State, that is, concerning the intention of the Legislature of that State in the passage of an act, can not be safe authority in another State even upon a question of the meaning of a statute framed in the very same words. The Legislature of New York meant one thing by the language used, and the Legislature of another State may have meant something else, and so the courts of each State may have declared, and rightly. To say, therefore, that the decisions are in conflict, is incorrect, and to attempt to deduce the true rule of law as applicable to both States is vicious."

It is impossible to comprehend how any decision or series of decisions of other States can make the question of fraud in this State and in this character of action a question of law.

Plaintiff in his brief says, "At the time the chattel mortgage was given, did defendant have reasonable cause to believe that Hubbard was insolvent?" Instead of following the argument of plaintiff as to defendant's knowledge, let us apply this one argument to the facts shown. Where is there in the record any evidence that Hubbard, the assignor, at the time he delivered the mortgage to defendant, was indebted to any firm, corporation, or individual other than defendant, except the reiterating of the language in the petition that he was insolvent, which is denied by the answer?

Who was defrauded by the giving of the mortgage complained of, and in what amount, and when did their claim fall due, as shown by the record, except the assignee as such, and he doesn't count. The assignee in the case can only represent the creditors. Who are they as shown by the record? It is clearly shown by the record that the assignor feels himself aggrieved by being, as plaintiff says in his brief, tricked into giving a mortgage to run

a short time instead of one year; but his wrongs in that respect can not be considered in this action. We find in the record attached to plaintiff's petition a copy of the mortgage in controversy, and among its provisions is the following: "It is agreed between Phares C. Hubbard, party of the first part, and Lee-Clarke-Andreesen Hdw. Co., party of the second part, that Phares C. Hubbard shall continue to buy and sell general hardware in the ordinary course of business, applying the entire proceeds therefrom toward the usual running expenses of the business, and the balance to the reduction of the mortgage debt."

After considering all the evidence and facts in this case as shown by the record, we are of the opinion that if Phares C. Hubbard, at any time, had contemplated making an assignment, prior to the execution of the mortgage in question, he had fully abandoned such an idea before giving said mortgage, and that the mortgage here in controversy was not made or received in violation of the provisions of the assignment statutes.

*Affirmed.*

POTTER, C. J., and CORN, J., concur.