204

ALBERT RAY TRUSLER and ANNA L. TRUSLER, husband and wife,

*Plaintiffs and Appellants,*

vs.

FOSTER C. GRIGSBY,

*Defendant and Respondent.*

(No. 2679; July 26th, 1955; 286 Pac. (2d) 603)

For the plaintiffs and appellants, the cause was submitted upon the brief and also oral argument of R. G. Diefenderfer and John F. Raper, both of Sheridan, Wyoming.

For the defendant and respondent, the cause was submitted upon the brief of Mahoney & Wilkerson of Casper, Wyoming, and Harry F. Schwartz of Sheridan, Wyoming, and oral argument by Mr. J. F. Mahoney.

## OPINION

RINER, Chief Justice.

Anna L. Trusler and her husband, Albert Ray Trusler, as plaintiffs brought their action in the district court of Sheridan County to cancel a mineral deed by which the wife had conveyed to one Foster C. Grigsby an undivided one-half interest in all the oil, gas, and other minerals in and under and that may be produced from certain lands in Sheridan County, Wyoming, described as follows: SW¼NE¼, SE¼NW¼, E½ SW¼, SE¼ sec. 24, T. 58 N., R. 85 W., sixth principal meridian, containing 320 acres more or less. Being unsuccessful in that action, they have brought the case here by direct appeal, seeking a reversal of the judgment in the court below. That judgment was rendered by the court, no jury being called, and, omitting formal parts, is to the following effect:

"Whereupon the Court proceeded to take and hear the evidence and the testimony of the parties and their witnesses and, upon a full consideration of the issues, of the applicable law, and of the facts as the same appeared by admission, evidence and testimony, made and entered its findings of fact; its conclusion of law,

and its judgment thereon, all as follows, to-wit:

## "FINDINGS OF FACT

"In addition to the facts admitted in the pleadings and by stipulation between the parties, the Court makes the following findings of fact, to-wit:

"1. The mineral interest conveyed by the plaintiff, Anna L. Trusler, to the defendant, Foster C. Grigsby, was not owned, held and occupied by the plaintiffs as homestead property. This allegation was abandoned by the plaintiff in open Court.

"2. That at the time the mineral interest in question was conveyed, to-wit, April 12, 1952, the lands in question were of no value as oil producing properties and that no oil, gas or other hydrocarbon substances were then being produced therefrom; that any value of the mineral interest conveyed was prospective, remote and speculative only, a fact which was known to both the plaintiffs and the defendant.

"3. That the consideration paid for said mineral interest, to-wit, $5,500.00, was not inadequate or insufficient and there is no showing made that said consideration was not commensurate with the value of lands similarly situated.

"4. That the mineral deed in question, together with its acknowledgment, as well as the draft and the written receipt therefor are complete upon their face and are certain and definite as to the parties' engagement.

"5. That the said mineral deed in question represents the entire contract of the parties and the full extent and manner of their undertaking.

"6. That at the time the plaintiff, Anna L. Trusler, made and executed the mineral deed in question she understood the full nature of the transaction in which she was engaged.

"7. That at the time the plaintiff, Anna L. Trusler, made and executed the mineral deed in question, she acted of her own free will and accord and not by reason of any coercion, duress, or undue influence on the part of the defendant or anyone acting in his behalf.

"8. That the plaintiff, Anna L. Trusler, was not in-

duced to make and execute the mineral deed in question by any misrepresentation, false representation, or fraud on the part of the defendant or anyone acting in his behalf.

## "CONCLUSION OF LAW

"The Court makes the following conclusions of law:

"1. That the mineral deed made and entered into under date of April 12, 1952, wherein the plaintiff, Anna L. Trusler, together with other signatories, conveyed and warranted to the defendant, Foster C. Grigsby, an undivided one-half interest in and unto all of the oil, gas and other minerals in, upon and under the following described property situate in Sheridan County, State of Wyoming, to-wit: The SW¼NE¼, SE¼NW¼, E½ SW¼, and the SE¼ of Section 24, Township 58 North, Range 85 West of the 6th P.M. witness and constitutes a good, valid and legal conveyance of said interest to said defendant.

"2. That the plaintiffs herein should take nothing by their petition herein and that title to the above described interest should be quieted in the defendant, Foster C. Grigsby.

## "JUDGMENT

"IT IS, THEREFORE, BY THE COURT ORDERED, ADJUDGED AND DECREED

"1. That the plaintiffs, Albert Ray Trusler and Anna L. Trusler, take nothing by their petition and that judgment be, and hereby is, entered for the defendant, Foster C. Grigsby, on each of the five separate causes of action contained in plaintiff's petition.

"2. That the defendant, Foster C. Grigsby, have judgment against the plaintiffs and each of them upon his cross-petition, quieting title in him, as owner, against any and all adverse claims of interest now, or hereafter, asserted by the plaintiffs herein or either of them, or anyone claiming by, through or under them, in and unto the following described mineral interest, to-wit: an undivided one-half interest in and unto all of the oil,

gas or other minerals in, upon or under the following described real property in Sheridan County, State of Wyoming, to-wit: The SW¼NE¼, SE¼NW¼, E½ SW¼, and the SE¼ of Section 24, Township 58 North, Range 85 West of the 6th P.M.

"3. That the costs of this action are assessed at $22.30 and are taxed to the plaintiffs herein.

"4. That the plaintiffs are allowed their exception."

As indicated above, dissatisfied with the result obtained in the district court, plaintiffs as appellants have brought the cause here by direct appeal for review.

The facts so far as they control the disposition of the case were and are in dispute. The testimony of the witnesses produced by the parties appears to be in hopeless conflict. Plaintiffs' witnesses recall and testify fully concerning the transaction which took place on April 12, 1952, in the Randall home in Sheridan between Mrs. Trusler and most of her children (by a former marriage) and one William J. Kirven, as the representative of Foster C. Grigsby and his associate, Jeff Hawks. Preliminary to this date, Mrs. Trusler was the owner of certain lands situated on Ash Creek in the northern part of Sheridan County. These lands had been set over to her under probate proceedings connected with the estate of her deceased first husband, Ernest A. Kester. She, however, considered that her children by her first husband were definitely interested in this land and that she merely held it for them. Subsequently, she married Albert Ray Trusler and was his wife on the date in April 1952 as mentioned last above. Prior to that date, Mrs. Trusler had given an oil and gas lease to the Shell Oil Company, which covered the 320 acreage involved in this present action and other lands she owned, for a royalty interest of one-eighth in all production. That company turned those lands with other leased lands in the vicinity over to J. Ray McDermott & Co., Inc., for exploration and de-

velopment, if oil was discovered. Previously, some test wells had been drilled in the general vicinity of Ash Creek which were to the knowledge ofMrs. Trusler nonproductive of oil. None of these wells were on her lands. Mrs. Trusler also knew generally that a well was being drilled by the McDermott Company on a nearby piece of land owned by one Elsie Barry, but she knew nothing of the progress of that well or of any discovery of oil therein. At that time neither she, her daughter (Anna L. Randall), the daughter's husband (Robert W. Randall), her son (Richard L. Kester), nor the son's wife (Betty V. Kester) knew much about oil royalties or their value or about sight drafts for the payment of money.

It seems that on April 11, 1952, the McDermott people by what is designated as a "drill-stem test" established the discovery of oil in the Elsie Barry well. As was to be expected, it was soon rumored around the city of Sheridan that this had happened; but no details were forthcoming at that time. Mrs. Trusler and her children heard the rumors late in the evening of April 12, 1952, while they were being solicited for a mineral deed to be given to Grigsby covering a portion of her reserved oil and gas rights as set forth infra, but had no opportunity to investigate the matter until the following day which was a Sunday, Easter Sunday in fact. On that date they drove to the Barry well and learned at first hand that oil had been discovered in that location.

Grigsby was an oil broker and speculator in oil and gas lands of considerable experience as was also Hawks. It seems they also had learned that oil had been discovered in the Ash Creek vicinity; and about noon on Saturday, April 12, 1952, the two men agreed jointly to endeavor to acquire some oil royalty interests in land located near the Barry well aforesaid. Hawks forth-

with used the long distance phone from Casper, Wyoming, and talked to Kirven at that person's home in Buffalo, Wyoming. Hawks gave Kirven instructions to immediately acquire royalty interests in the Barry well vicinity and to draw a sight draft on Grigsby in payment of the purchase price of the land which he might select. Hawks knew that Kirven was a young man engaged in the practice of law in Buffalo, Wyoming. Kirven had engaged in some oil and gas land work previously. He was the County and Prosecuting Attorney of Johnson County. While his experience with oil and gas rights and purchases was limited, he had dabbled to some extent in them before this transaction arose. As a result of this phone conversation, Kirven undertook to and did go to Sheridan to see what could be done to carry out the agency thus conferred. Arriving in Sheridan, he checked titles to land in the vicinity of the Barry well and then sought to see Mrs. Trusler whom he found about 6:00 P.M. at the home of her daughter and son-in-law, the Robert W. Randalls. It appears that Mrs. Trusler was not very well at that time, and her family doctor had given her some sedative tablets to quiet her nerves and enable her to get some needed sleep and rest. She took this medicine about 8:00 P.M. on April 12, 1952. When Kirven first talked with Mrs. Trusler about 6:00 P.M., he endeavored to consummate a transaction with her for certain of her mineral rights but was unable to accomplish this at that time. Consequently he left the Randall home about 6:30 P.M., informing Mrs. Trusler he would return in about an hour. This he did. The record discloses that the Randalls, husband and wife, and Richard L. Kester were present at this time in the home. Kirven stayed and talked with Mrs. Trusler, her son, her daughter, and son-in-law until 1:30 A.M. the following Sunday, endeavoring to persuade Mrs. Trusler to sell her oil and gas rights to Grigsby and finally

offering to give them a sight draft for $5500 drawn on Grigsby in payment for the rights on these lands. The Randalls and Richard L. Kester talked the matter over with Mrs. Trusler; and her son, Kester, said to her (according to the testimony of Kirven) : "Well, that's twice as much money as you've ever been offered before. I think that you should do it." Of this conversation Kirven also testified that:

"Q. Now, there has been testimony about a call to Missouri, placed by you, to another Kester son in Missouri. Can you state how that call originated, what its purpose was? A. Yes. I don't think at the time I knew there was another son and Mrs. Kester then had asked Mr. Randall what he thought of it and he said, well, he thought there'd be other dry holes out there and 'you can't tell which way this one is going to go. At least, if it does turn to water, why, you'll have some money.' She said, 'Well, I think probably I ought to check with my other son,' and I asked her where he was and she said he lived at Osceola, Missouri. And I said, 'Well, I can arrange to call him there. In addition to the other money we are giving you I will pay the telephone call if you wish to talk to him,' and they assented to that. I had a telephone credit card and I went over to the telephone and placed the call, although I did not talk to Mr. Kester,—I don't remember his first name— who was in Osceola, Missouri.

"Q. You didn't talk with him at any time during the evening? A. On the telephone? No, I did not.

"Q. Did you overhear the Sheridan end of those conversations? A. In a general way I did, yes.

"Q. Are you able to state what the tenor of the reaction at the Sheridan end of the conversation was? A. Well, Mrs. Randall was the first one to talk with him and she explained that they had an offer of $5500.00

for half of the minerals under 320 acres and asked him what he thought of the deal and stated that she was calling to get his reaction before they entered into any agreement.

"Q. Were you able to determine what his reaction was from the conversation which you overheard? A. Yes, and in general I don't think he gave them any definite answer; just told them whatever they wanted to do was all right with him.

"Q. Had you at this time prepared a deed? A. No.

"Q. Conveying any minerals? A. No, I did not prepare any deed.

"Q. Did you have blank mineral deed forms with you? A. Yes, I did.

"Q. Did you at any time exhibit a blank form to these people? A. After the telephone conversation Mrs. Trusler said, 'Well, I guess we'll go ahead with the deal,' and I said, 'All right, I'll get the mineral deeds out.' I took out a pad of mineral deeds and scattered about 3 copies among those people in the room and showed them the mineral deeds.

"Q. Did you have the typewriter in the house with you at the time? A. No, I did not. The typewriter was in the car.

"Q. Did you subsequently, on that same evening, prepare a mineral deed, to be precise, the mineral deed which is in evidence here? A. Yes. I went out to my car and brought in my portable typewriter and someone—either, I believe, Mr. or Mrs. Randall—procured a card table for me from their closet, or something, brought it into the living room and they set up the card table.

"Q. Was that subsequent to the telephone call to

Missouri? A. That was subsequent to the telephone call.

"Q. Did you then prepare a deed? A. Yes. I placed my portable typewriter on the card table and prepared the original mineral deed and several copies.

"Q. After you had prepared the deed, what was done with it? A. Well, next I prepared a draft with one carbon copy and typed 'Original received in payment;' on the copy of the draft.

"Q. I show you an instrument which has been admitted into evidence as Defendant's Exhibit 'C' and ask you if that is the copy of the original draft which you prepared? A. Yes, sir.

"Q. Did you prepare that at the same time or shortly after preparing the deed? A. Immediately after preparing the deed I prepared the draft and copy.

"Q. Was there any further discussion concerning the signing of the deed at that time? A. Well, before the deed was signed I showed the deed to Mrs. Trusler and Mr. and Mrs. Randall gathered around, as did Richard Kester, and they looked at the typed-in portion of the deed and I had their names on there and, also, one of them asked why I had '$10.00', and I said, 'Well, just that it's no concern of your neighbors or anybody else what amount of money you received for these mineral rights so we'll just make it "Ten or more" dollars.' And I showed them the description and we compared the description on the mineral deed with the take-off map, which I had, showing the 320 acres out of their 680 acres on which they owned minerals that I was buying.

"Q. Now, how did you learn the names of the Trusler children? Was that information given to you by someone present there? A. Yes. It was given to me by Mrs. Trusler or I possibly asked them directly what their

names were. And I asked Mr. Kester what his wife's name was.

"Q. Did you then type in those names, as given to you, on the deed? A. Yes, as they told them to me I typed them.

"Q. And on the draft? A. And on the draft.

"Q. Was there any further discussion about the signing of the deed at that time? A. No, we just proceeded to sign it."

Later on Kirven saw Mrs. Trusler at the office of Mr. Glenn Kinsley, another attorney-at-law, in Sheridan. This was on April 28, 1952. Mr. Kinsley, Mrs. Trusler, Mr. Grigsby and Mr. Kirven were present. Regarding this, Kirven testified:

"Q. Did you have a discussion then of this transaction at that place? A. Yes.

"Q. Do you recall what Mrs. Trusler said regarding the deal? A. Well, Mrs. Trusler stated that she would like to get out of the deal; that she didn't want to go ahead with it; that she'd rather not have that mineral deed standing; that she would like to revoke the transaction; that *she wasn't getting enough money, or words to that effect.* (Italics supplied.)

"Q. How long did that conversation last? A. Oh, I imagine we were in Mr. Kinsley's office no more than 15 minutes, 15 to 20 minutes, maybe."

Mrs. Trusler testified that:

"Q. Now, on the Monday following April 12th, the night Mr. Kirven was there, did you receive any offers to sell any of your minerals to any other person? A. Yes.

"Q. Have you since then received offers? A. Yes.

"Q. At substantially higher figures than Mr. Kirven paid you? A. Yes.

"Q. That was all on the Monday or afterward following his visit, is that right? A. Yes.  *  *  *

"Q. Just state what the conversation was you had with this person. A. Well, they insisted that I had plenty of them (royalties), many more than I could possibly ever use in a lifetime; disregarded my three orphan children.

"Q. State whether or not there was anything mentioned for price? A. I told them it wasn't for sale at any price.

"Q. Told them that it wasn't for sale at any price? A. Yes.

"Q. And what happened after that? A. Well, they talked awhile and left.

"Q. Did you know who the person was? A. I did at the time but I don't remember their names.

"Q. No price at any time was mentioned? A. *One of them offered $50,000.00 but I told them 'no.'* (Italics supplied.)

"Q. *When was that?* A. *On the Tuesday.* (Italics supplied.)

"Q. Following the time Mr. Kirven was there? A. *Yes.* (Italics supplied.)

"Q. And you don't know who the party was? A. No."

It is interesting to note that the brief of counsel for plaintiffs contains this frank admission:

"The record shows a direct conflict in the testimony of Mrs. Trusler and her children, on the one side, and that of Kirven, on the other side, as to what happened during the long meeting. According to the Trusler group of

four people, Kirven was told repeatedly and from the beginning of the discussion, that Mrs. Trusler did not want to sell, and was given to understand that his mission was not welcomed. They all testified that the deed was given only because Kirven said that he wanted something to show to Mr. Grigsby that he, Kirven, had been on the job and because it was the express understanding of all of them present that the deed would be of no effect unless the draft was cashed. Kirven denied all this testimony and testified, in effect that the meeting was in all respects pleasant, harmonious and friendly."

Counsel for the plaintiffs in their brief insist that we should disregard at this time the case of Edwards v. Willson, 30 Wyo. 275, 282, 283, 219 P. 233, 235, and the long line of cases cited therein as follows:

"Counsel for plaintiff argue that this is an equity case and that this court should try the case de novo upon the record before us. But that has never been done in this state since the adoption of the Code of 1886 abolishing distinctions between actions at law and suits in equity. The rule followed by this court in actions at law where there is conflicting testimony is well known and it is not necessary to cite the cases. And the same rule has been applied in equity cases. Conway v. Smith Mercantile Co., 6 Wyo. 468, 46 Pac. 1084; Patterson v. Hardware Co., 7 Wyo. 401, 52 Pac. 1085; Columbia Min. Co. v. Duchess Min. Co., 13 Wyo. 244, 79 Pac. 385; Phelan v. Cheyenne Brick Co., 26 Wyo. 495, 188 Pac. 354, 189 Pac. 1103; McFadden v. French, 29 Wyo. 401, 213 Pac. 760. The rule, with its reasons, is stated in Conway v. Smith Merc. Co., supra, as follows:

" 'The question is whether there is sufficient evidence to sustain these findings. It is not whether this court, from the written report of the evidence, would so find. The trial court had most of the principal witnesses before it, giving that court the better opportunity to judge of their character and credibility.'

"The rule was also applied and the same reason given, in Lellman v. Mills, 15 Wyo. 152, 180, 87 Pac. 985, an equity case involving the dissolution of a partnership."

Of course, since October 29, 1923, when that case was decided, there have been many other decisions of this character unanimously approving the doctrine announced in this case, and it will be noted that we still have on our statute books the section referred to in the excerpt above-quoted, viz., 3-301, Wyoming Compiled Statutes, 1945, which reads:

"The distinction between actions at law and suits in equity, and the forms of all such actions and suits heretofore existing are abolished, and in their place there shall be hereafter but one form of action, which shall be called a civil action."

This section was again quoted by the unanimous opinion of this court in Edelman v. Edelman, 65 Wyo. 295, 203 P. 2d. 952, decided as late as March 15, 1949, wherein we denied the petition for rehearing in that case. Counsel filing that petition in the Edelman case must have overlooked what was then said by this court. It is significant that he made no protest of the ruling announced at that time—at any rate, we do not recall that the contention he now makes that he was entitled to a trial de novo was at all advanced then.

We observe that 5 C.J.S. 759, 760, discussing the rule in equity cases, says:

"Particular deference and weight is accorded to the lower court's findings, and they are seldom interfered with, where the evidence is oral, partly oral, oral and conflicting * * *."

(Cases supporting this view will be found cited in no less than eight solid columns of authorities.)

In Bruch v. Benedict, 62 Wyo. 213, 241, 242, 165 P. 2d 561, 570, 571, decided January 29, 1946, this court pointed out in an equitable action (one for the quieting of title) that the rule of law is applicable that: " 'if the evidence is conflicting or there is evidence to sustain the finding the appellate court will not interfere

unless the finding is clearly erroneous, or so clearly against the evidence or the great weight (of the evidence) as to be manifestly wrong.' 5 C.J.S., Appeal and Error, § 1643, page 562."

This case also is cited in 5 C.J.S. 164 (Ann. Cum. Part 1955) with decisions from thirty-two other appellate court jurisdictions.

We must decline to change the rulings announced in this court over so many years.

Counsel for plaintiffs seem now finally to rely upon the old text of 3 Cyc. 368 but does not notice that that text, at pp. 370, 371, 372, says:

"(B) *Same Rules Applied as in Other Actions*—(1) In General. On the other hand, the extent of the review seems no greater in many cases than in other actions, generally, where the findings of fact are by the court, without the aid of a jury. Thus, the chancellor's decision will not be disturbed where there is any sufficient evidence in support thereof and where the testimony is conflicting, he being regarded as the more appropriate trier of the facts in such cases, and a decree involving the finding of fact upon conflicting evidence will not be disturbed unless it is clearly wrong, or unless the findings are clearly against the preponderance of the evidence.

"(2) When Witnesses Are Heard Orally. The rule of procedure against interference with the findings of fact made by the lower court is in many cases applied strictly where the trial of the suit proceeds upon oral examination of witnesses, upon the principle of the superior advantage of the trial court to weigh the evidence, as distinguished from cases where the evidence is contained in depositions."

At that point in the text, many appellate decisions are set forth as supporting the rule as stated in the Bruch v. Benedict case, supra.

It is evident that counsel for plaintiff desire another trial de novo in this court. We are not inclined at this

time to grant or establish any such practice. Indeed, in the case of Corey v. Pennington, 65 Wyo. 301, 323, 200 P. 2d 333, 340, a workmen's compensation case, equitable in nature, this court unanimously stated as follows:

"Some of the cases to which our attention is directed by claimant are from reviewing courts empowered by law to make their own findings upon the record before them as in the State of Michigan, for example, 'to make such further orders in respect thereto as justice may require.' Pub. Acts 1912, Ex. Sess., No. 10, § 12. Schroetke v. Jackson-Church Co., 193 Mich. 616, 160 N.W. 383, L.R.A. 1917D, 64 where the court refers to the practice in that state and cites their earlier decision of Andrejwski v. Wolverine Coal Co., 182 Mich. 298, 148 N.W. 684, Ann. Cas. 1916D, 724 where the provision of the law on the point is quoted as above set forth. As all members of the profession in Wyoming know, as are not authorized to try cases anew in this court but only to correct prejudicial errors of law made in the trial courts of the state."

See also Holly Sugar Corporation v. Fritzler, 42 Wyo. 446, 296 P. 206; Swanson v. Johnson, 58 Wyo. 1, 122 P. 2d 423; First National Bank of Green River v. Barrett, 54 Wyo. 394, 93 P. 2d 510.

In addition to the rule prevalent in this court concerning a case decided by the district court on conflicting testimony, there is also the rule adopted and first announced in Willis v. Willis, 48 Wyo. 403, 49 P. 2d 670, and followed in Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P. 2d 505, and cases cited.

The testimony of Mrs. Trusler hereinabove set forth should be considered with that of Grigsby where he said:

"Q. Where did you meet her? A. I saw her twice that day, which was Monday, the 28th. I first went to Mr. Kinsley's office. Then I went to see Mrs. Trusler. And

I saw her again in Mr. Kinsley's office that afternoon.

"Q. Was there anyone else present? A. There was no one present when I went to see Mrs. Trusler at her apartment but Mr. Kirven was with me at Mr. Kinsley's office.

"Q. There were then Mr. Glenn Kinsley, Mrs. Trusler, Mr. Kirven and yourself, is that correct? A. That's correct.

"Q. Did you have a discussion regarding the mineral deed there? A. Yes, sir.

"Q. Did you ask to have your draft returned to you at that time? A. No, sir.

"Q. Was there any representation made to you by Mrs. Trusler concerning the tentative character of this agreement? A. None whatever.

"Q. Was there any indication that she thought she had not been paid enough money? A. Yes, because she made a remark along that line.

"Q. What was her remark? A. Well, when I went to the house Saturday, which was the first time I saw her, she said that there was not enough money involved and suggested that I forget about her land and go buy on to someone else's land. And the same discussion came up in Mr. Kinsley's office when the four of us were together.

"Q. Did she suggest any additional sum that she would like to have? A. Her remark was to the effect that it was not enough money. Then she addressed the remark, made a remark, to Mr. Kinsley to the effect that if the interest in the deed was reduced from a half

to a quarter she would be willing to go through with the deal.

"Q. Did you agree to any such reduction? A. No, sir. * * *

"Q. I will ask you whether or not Mrs. Trusler seemed to be aware at that time of the nature of the instrument which she had signed? A. She was."

It cannot be disregarded that during the long interview on the evening of April 12, 1952, while Mr. Kirven was endeavoring to induce Mrs. Trusler to sell mineral rights to Grigsby that this woman had the benefit and advice of, and consultation with, her entire family of adult children. It is urged for the plaintiffs that Kirven persuaded her to act against her will; but as we have already pointed out, her adult children were present at all times in the Randall home during the long interview Kirven had with Mrs. Trusler from 6:00 P.M. until approximately 1:30 A.M. Insofar as the record shows, the children took no exception to what Kirven said to their mother. Not only is this so but in order that Mrs. Trusler could have the advice and suggestion of her other son who lived in Missouri, Kirven put through, and paid out of his own pocket for, a long distance phone call to Osceola, Missouri, where her other son lived. This hardly seems to us to present the act of one who is endeavoring to overreach Mrs. Trusler as urged and claimed by the plaintiffs. The son in Missouri merely told his mother that what she, his brother, and sister decided to do would be agreeable to him.

In view of the record herein and the authorities we have reviewed, it would seem that the trial court could very easily have reached the conclusion that the plain-

tiff, Anna L. Trusler, became dissatisfied with the bargain she made with Kirven on April 12, 1952, and desired to void it. We are not inclined to interfere with the findings and judgment of the trial court, and that judgment should be affirmed.

*Affirmed.*

BLUME, J., and HARNSBERGER, J., concur.