In the Matter of the Workmen's Compensation Claim of Alma C. Corey, Widow of Emmett E. Corey, Deceased, Employee of B. D. Pennington Company, Employer.

ALMA C. COREY, Widow of Emmett E. Corey, Deceased, on Behalf of herself and minor children of Emmett E. Corey, Deceased,

*Claimant-Plaintiff and Appellant,*

vs.

B. D. PENNINGTON COMPANY, Employer,

*Defendant and Respondent.*

(No. 2408; December 8th, 1948; 200 Pac. (2d) 333)

302

For Claimant-Plaintiff and Appellant the cause was submitted on the brief of Kline and Kline of Cheyenne, Wyoming and oral argument by Arthur Kline.

For Employer-Defendant and Respondent the cause was submitted on the brief of C. A. Swainson and John C. Pickett both of Cheyenne, Wyoming and oral argument by Mr. Pickett.

## OPINION

RINER, Chief Justice.

This direct appeal proceeding is brought here by the claimant and appellant, Alma C. Corey, the widow

of Emmett E. Corey, deceased, the latter being formerly an employee of the B. D. Pennington Company, the defendant and respondent herein. For convenience and brevity the appellant will usually subsequently be referred to as the "claimant" and the respondent as the "defendant". The review sought is of a judgment of the District Court of Laramie County declining to make an award under the Workmen's Compensation law of this state to claimant above named.

May 27, 1946 the defendant filed in the office of the clerk of said county an "Employer's Report of Accident" on a printed form as required by the Workmen's Compensation law of Wyoming stating in substance so far as may be now pertinent that Emmett E. Corey, age fifty-two years, a resident of Cheyenne, Wyoming, who had been in the service of the defendant one month, on May 23, 1946 at 11:15 A. M. was injured; that the defendant was doing construction work for the Frontier Refining Company in the City of Cheyenne; that the injury to Mr. Corey occurred while he:

"was walking along the edge of a scale pit floor when his foot slipped off the edge. While trying to regain his balance he rammed his hand into a ⅝" reinforcing steel rod";

that this accident grew out of employment and that it was not due solely to the culpable negligence of the employee; that Corey was employed as a carpenter; that the employee's left hand was wounded by a ⅝" steel rod; that the workman died, but the cause of his death was unknown; that the attending physician was Dr. Kahn of Cheyenne, Wyoming at Memorial Hospital in that city; that the dependents of Corey's family were his wife, Alma, two daughters and a son aged respectively, the daughter Frances, seventeen years, the daughter Marge, twenty years, and the son Dennis, six years. This report was signed and verified by the

defendant through its superintendent, one S. N. Morrison.

June 27, 1946 Mrs. Corey filed her "Claim for Award" under the law aforesaid on behalf of herself and minor children whom she listed as Frances born 8-19-29 and Dennis born 5-28-39. She described the manner in which the injuries to her husband occurred in the language of the employer's report above quoted.

Just at this point it may be noted that in the sworn testimony in this case hereinafter reviewed we find nothing said by the witnesses which indicates that Corey "slipped off the edge" of the concrete platform on which he was working.

Sometime after these filings were made—the exact date not appearing, as the original appears to have been mislaid and a substituted copy placed in the files instead—the defendant filed a protest gainst allowing the claim of Mrs. Corey:

"for the reason that the death of Emmett E. Corey was not the result of injuries sustained by him while in the employ of B. D. Pennington Company, and that such claim for award should not be allowed under the provisions of the Workmen's Compensation Law for the State of Wyoming."

Under date of June 29, 1946 the attending physician Ernest A. Kahn submitted his fee bill for an electrocardiagram, physical examination, and written report. July 1 the district court made an order of award allowing this bill in the sum of $20. October 30, 1946 the Memorial Hospital by its manager Z. E. Sevison submitted its "Hospital Fee Bill" which was on November 1, 1946 allowed by an order of award for $12.25. The bill of the hospital was for one day's ward service and oxygen with tent. Under the inquiry "nature of the injury" on this hospital fee bill

appears the statement—and the source of this statement is not given nor does it appear from the record at bar—"stuck self while at work at Frontier Refinery—shock brought on coronary thrombosis". The opinion reported by the attending physician in his written report was "death caused by acute coronary occlusion of the anterior descending branch of left coronary artery".

The cause was tried to the court without a jury on December 10, 1947 with the result stated above.

The specifications of error argued by the parties are in substance that the judgment of the district court was not sustained by sufficient evidence and was contrary to law.

In Dulaney vs. Jensen, 63 Wyo. 313, 181 P. 2d. 605 it was said:

"Under assignments of error of this character this court has frequently held that we: 'must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.'" And a partial list of cases was cited where this rule had been followed in this jurisdiction.

We necessarily apply it in the case at bar in order to do so properly a somewhat extended review of the material testimony is required which was submitted to the trial court.

The claimant testified that her husband was fifty-one years old at the time of his death, and that they had been married thirty-one years; that when the death occurred they had two minor children, Frances, seventeen years old and Dennis, six years old; that her husband worked for the Union Pacific Railroad for two years as a brakeman and six weeks as a car-

penter for the defendant; that prior to May 23, 1946 he was "always in the best of health" and "had the appearance of being a very healthy man in every way;" that prior to May, 1946 he had never been sick; that the morning of May 23, 1946 before he went to work his appearance was "very good"; that he was "kidding and scuffling" that morning with a friend who came to borrow some fishing tackle; that she saw him in the hospital between 1:00 and 2:00 P. M. that day and then his face was pale and his hands rather cold and clammy; and that her husband died about six o'clock P. M. that same day.

James Lamont called as a claimant's witness and the only eye witness of the accident other than Corey testified that he worked with Corey as a carpenter at the refinery for two or three weeks before the accident; that he and Corey worked together as partners, in pairs; that the day Corey met his death, he seemed in good health, talking and joking as usual; his face color then was as usual; that the accident took place around 11:00 A. M.; that witness and Corey were engaged in laying out lines to set concrete forms; that witness was at one corner of the form and Corey came over and got the end of either a chalk line or tape line and started across the form, which was from twelve to twenty feet wide; that when Corey "got about half way across; he stumbled or something"; that he reached out his hand to protect himself and his hand hit a dowel pin; that he then straightened up; that a dowel pin is a reinforced steel rod in the concrete about center way of the form, the pin being about five eighths of an inch in diameter; that he saw Corey fall but he did not lose consciousness then; that when he straightened up he kept shaking his hand; that Lamont thought he said to Corey then "you hurt yourself?" that Corey replied, "no, not much"; that Lamont said after looking at Corey's hand "just a little spot of blood

here. It is good, it is bleeding. Not much danger of infection. You needn't worry about that"; that these two men went ahead with their work then; that Ford, the foreman came soon and took Corey to the First Aid Station; that Corey was gone probably fifteen minutes and that he returned with his hand wrapped up he still kept on shaking the hand like a person does when he has cut his hand and he snaps the blood off; that Corey soon got to feeling sick at his stomach and kept spitting and complaining of pain in his chest; that during the lunch hour he stayed in his car but finally became so ill he was taken to the hospital; that the bruise on Corey's hand was about the size of a dime; that "it was just bruised. It looked on one side as though there had been a sharp point on this dowel pin that just pricked his hand enough to make it bleed a little bit"; that when Lamont looked at Corey's hand it was "just a red spot bleeding a little as near as I can remember on one side"; that soon afterwards Corey said that he was feeling sick to his stomach, "he was pale. He looked bad."

On cross examination the same witness stated that he and Corey at the time of the accident were measuring on the outside on the south end of the scale pit, "laying out on a footing numbers" on a concrete floor which was the base of a scale; that the dowel pins were around the edge of this floor and extended eighteen or twenty inches in height above the concrete in which they were set; that aside from these dowel pins the concrete was smooth, "that is, just shored in the rough"; that:

"We were measuring off mean measurements, then snapping chalk lines. I don't remember whether it was the chalk line he came to get or the tape line. Anyway, I think he was standing in one corner, southwest corner of the scale pit and he took the end of the line, whatever it was, and started across. When he got about midway then he tumbled or stumbled";

that witness and Corey did no hammer work, nail driving.

Ford, the carpenter foreman on the job, also claimant's witness, stated that when Corey went to work he appeared to be in usual health; that he saw Corey after the accident and the latter said "he had skinned his hand a little"; that witness looked at Corey's hand and saw just a little puncture—just like somebody hit a sharp corner of those square steel dowels; that witness saw Corey in his car after lunch "very much doubled up, complaining that he felt he was filled up in his chest" and looked "terrible sick"; that we had another car and we picked him up, put him in it and carried him to the hospital; that he was not able to get out of his own car.

On cross examination this witness said Corey told him that his (Corey's) hand stung him; that was about all; that he (Corey) "didn't feel it was enough to go and have anything done for it"; that the injury appeared to be slight, one with which we could "run around with all day"—scratches like that; that Corey was not sick after leaving the First Aid or dressing station.

Marjory Andresen called as a witness for claimant and a doctor specializing in pathology aided in the autopsy performed on the body of Emmett E. Corey on or about May 23, 1946. She stated that the autopsy disclosed that:

"This man had a small abrasion on his left palm which appeared to be superficial although no deep dissection of it was done. The major findings were limited to the heart. His heart was not hypertrophied but it was dialated and at the apex or tip of the heart the wall felt softer than it did in the remainder of the heart. And dissecting out of the artery which supplies the heart muscle there was a narrowing of the anterior branch, descending branch of the left coronary vessel.

This was about half an inch in length and the vessel at that point was approximately a third the diameter of the rest of the vessel. And in this area of narrowing there was a rather fresh clot of blood";

that the condition shown by this examination was "coronary sclerosis with narrowing of the artery" with a fresh clot of blood in the artery; that by arterio sclerosis is meant a deposit in the wall of the vessel, part of it is calcium and part of it a cholesterol making up a hard area and different from the normal soft wall of the vessel; that she did not care to express an opinion as to the cause of Corey's death.

On cross examination this doctor said that Dr. Kahn was at the autopsy; that this building up in the artery was about one half inch long; that this building up is a slow, gradual narrowing of the wall of the vessel requiring days or months or possibly years; that the blood clot found is the thing that finally cut off the blood supply going through that narrowed artery; that this blood clot was formed there in the matter of a few hours; that it was not a clot which came through the blood stream into that area; that there was no adequate relation in the heart condition of this man to the abrasion on the left hand; by "adequate" is meant that it did not come from this hand injury but was formed right in that narrow place; that the soft condition in the wall of the heart was due to this shutting off of the circulation.

Dr. Webb, as a medical witness for the claimant, having experience in several hospitals with cardiac diseases and having taught this subject in the New York Medical School stated that he did not think that the injury to Corey's hand was the direct cause of Corey's coronary artery occlusion; that a patient in Corey's condition would probably encounter a coronary thrombosis some time, the time being decided by

precipitation factors among which exertion and nervous or emotional disturbances are common; that the fall the man had and being taken by the foreman to the First Aid Station constituted a factor sufficient to be a precipitating cause for an occlusion in a man already afflicted with arterio-sclerosis; that as physicians, we are not certain what are the exact causes of a blood clot forming in the artery. On cross examination this witness said that the arteriosclerotic process is always life-long, its cause not being known; that a person so afflicted in the coronary vessels is in ever present danger of a fatal episode; that this fatal episode sometimes occurs in sleep; that he does not know whether there is any precipitating cause then; that thrombosis takes a couple of minutes, maybe ten or fifteen; that witness saw no reason to think that thrombosis had begun previously to Corey's fall but he (the doctor) did not want to say it did not.

George C. Hoffman as a witness for respondent, working as a carpenter for that company, saw Corey the morning the latter became sick and worked with him a while in the carpenter shop oiling concrete forms; that Corey left the shop close to 10:00 A. M. to go over to the scale about three hundred feet distant; that Corey came back to the shop about 11:20 A. M., showed witness his hand, and said he slipped and fell down on one of those re-enforcement bars sticking up; that witness saw on Corey's hand a "kind of brown and blue spot" about as big as a nickel in money; that it was not bleeding; that Corey had not gone to the dressing station as there was no dressing on the man's hand; that Corey looked nervous "what you call kind of scared like".

Dr. Kahn testifying for the respondent as a medical witness said that in his practice of seven years in Cheyenne, he has become familiar with diseases of the

heart and has had occasion to treat them; that about 1:30 P. M. witness saw Corey in the hospital when Corey "was in profound shock", complaining of severe "precardial chest pain"; that the man died about 6:00 P. M. that day; that witness was present at the autopsy performed that night; that at the time Dr. Kahn first saw Corey he diagnosed the latter's trouble as "acute coronary thrombosis"; that the change in the coronary vessell wall took a long period but the clot which occurred in that constricted area of the blood vessel occurred rather rapidly; that the clot occurred in the heart itself and did not come out of the blood stream as it would have stopped in the lungs before reaching the heart; that in witness' opinion neither Corey's stumble or fall nor the abrasion on his hand had anything to do with the cause of his death; that a person may have no warning at all when these attacks may come.

On cross examination this witness stated that "nobody knows the definite reason for the formation of the clot in coronary vessels at any particular time."

On his redirect testimony the same witness said that increased heart action due to fright or exertion, in his opinion, would not cause a clot such as was found in Corey's heart.

Dr. Phelps, also called as a medical witness on behalf of the defendant, stated that he had been in the practice of medicine in Cheyenne for twenty years; that he is familiar with diseases of the heart as a result of his practice; that he has treated at least several hundred cases of coronary thrombosis; that a coronary sclerosis is described thus:

"Within the wall of the artery itself calceum and other hard materials like cholesterine form and these formations gradually enlarge until they narrow down the vessel itself. In other words, it is an invasion of the

lumen or the tube, gradually narrowing it down. This process is one of long standing and certainly goes over a period of years in developing";

that it is possible that Corey's stumbling and striking of his hand on the steel rod, as Corey did, was sufficient exertion to cause occlusion of the coronary artery but "certainly very highly improbable"; that in a coronary occlusion;

"Usually it becomes so narrow that for some reason a clot forms in the narrowest point of the vessel. The exact reason or cause of the formation of this clot is not definitely known. We know this, simply, because, I think, as a matter without question, that as many occur during one's sleep as during periods of activity. All of us feel that incidents may enter into the cause of a coronary occlusion; but, because of the presence of so many instances in which there is no precipitating cause, the entire question is still an argumentative one";

that "we know a number of cases which occur, as stated before, when one's asleep. The patient is found dead in bed and an autopsy shows coronary occlusion. A number of these cases, again, had no previous symptoms"; that it was Dr. Phelps' opinion after listening to all the evidence presented that Corey probably stumbled as a result of an acute coronary occlusion,

"The stumble resulting from the onset of an acute attack in which he became dizzy or unsteady. The condition from that time on was progressive. The slightness of the injury, no one can say that it did not definitely precipitate the attack. However, it is much more probable that the stumble was the result of the attack and that the condition was progressive from there on. This man, by the testimony of several lay witnesses, very shortly afterwards kept opening and closing his hand or shaking his arms. That is not a common occurrence with a minor abrasion on the palm of the hand. He had discomfort in his arm, up in his muscles and he was working the muscles of his

forearm by doing that action. In any sort of shock which occurs to an injury of a major organ such as the heart, there is a sudden onset of shock with the resulting fall in blood pressure. The individual is temporarily more disturbed in most instances than he will be five minutes later. There will be a slight recovery of balance or control. Conditions such as this, however, as was evidenced by the termination of the case, was a severe shock from the onset to the general system or to the body in general. It is my opinion that this man, as I said before, stumbled or temporarily lost control as the result of an acute coronary occlusion rather than a slight injury precipitating the attack."

On cross examination this witness said:

"I listened to the testimony. No one seemed at any point to think of anything that had been in the way of this man."

To the query:

"Well, I believe the witness Lamont testified there was something there that might have been in the way and he stumbled on."

this witness responded:

"Yes, he said 'might have been.' There is no definite reason for a man on such a smooth area to stumble."

Continuing his testimony, the witness said that no one can tell definitely why or just at the time a clot formation may occur.

On redirect examination the same physician said that the blood clot could not have come from the injury to the hand directly through the blood stream because: "the blood from the hand has to go through his lungs first which goes into capillary areas which are too tiny for any clot to get through. The clot would come from the hand and lodge in the vessels leading to the lungs";

that this clot was actually formed in that portion of the heart which was affected and it did not come from

the outside; that a stumble with resultant injury to Corey's hand would have a very negligible effect upon the heart, if any.

Passing now to the questions submitted by the parties on their briefs and arguments herein, it seems to be urged in behalf of the claimant that because the district court made orders of award in payment of Dr. Kahn's fee bill and also the fee bill for hospitalization of this man Corey that these awards were a disposition of this case upon its merits. We do not think that this is so. The only issues involved in the disposition of these claims were whether the services were rendered and whether the fee bills were correct in amount and should be paid.

There is no determination of the cause of Corey's death in ordering the payment of these two bills. The district court at the time these awards were made gave no consideration to the protest of the defendant that Corey's death "was not the result of injuries sustained by him while in the employ of the" defendant. Of course, the injury to Corey's hand was incurred in the course of Corey's employment but no award is sought on that account. Indeed the medical testimony in this case is in accord, that the injury to Corey's hand did not cause the occlusion of the coronary artery which was the direct cause of Corey's death, when taken in conjunction with the narrowing of that artery, as the medical witnesses testify.

It may be noted also that the record fails to show that claimant objected to the payment of these bills. Even had she done so, it is difficult to perceive why the court improperly allowed them. The services performed were obviously necessary as an aid to the court in determining the real cause of the fatality. At the time the defendant filed its report, it was stated, as recited above, that the workman had died but the

cause of his death was "unknown". That statement taken in conjunction with defendant's protest could hardly be regarded as an admission of liability on its part for the death of this workman.

The Workmen's Compensation law provides in the first sentence of Section 72-102 W. C. S. 1945 that:

"Compensation herein provided for shall be payable to persons injured in extra-hazardous employment, as herein defined, or the dependent families of such, as die, as the result of such injuries, except in case of injuries due solely to the culpable negligence of the injured employee."

Section 72-106 W. C. S. 1945, subdivision (m) states also:

"The words 'injury and personal injury' shall not include injury caused by the wilful act of a third person directed against an employe for reasons personal to such employe, or because of his employment; nor a disease, except as it shall directly result from an injury incurred in the employment";

The controlling question in this case was whether Corey's slip, stumble or fall and the consequent injury to his hand incurred in his evident endeavor to save himself from falling flat had any causal connection with his death. As before stated, the injury to Corey's hand seems to be taken out of the case by the complete agreement of the medical testimony on the point that it did not cause the occlusion of the coronary artery. Relative to the effect of the slip or stumble and the partial fall which Corey experienced, the medical testimony is in direct conflict. Dr. Webb's opinion is that Corey's experience, as detailed by the testimony herein and which we have intentionally reviewed quite fully, i.e., Corey's fall and the accelerated heart action resulting, was sufficient to constitute the precipitating cause of the formation of the fatal blood clot. Drs. Kahn and Phelps' opinions are to the contrary, as we

have seen. In their opinion neither the stumble nor fall would have caused the clot to form in Corey's coronary artery.

32 C. J. S. 416, 417 on the authority of cases from many appellate jurisdictions in the nation says that:

"In case of a conflict between opinion evidence, whether that of an ordinary witness, or of a skilled or expert witness, and other evidence in the case, the jury, or the court trying a question of fact, is not, as a general rule, bound to accept the opinion evidence in preference to the other, but may judge the weight of each and determine the issue of fact as it deems proper; and, in general, the same rule applies where there is a conflict between the opinions of different experts or skilled witnesses, . . . "

So in McMahon vs. Midwest Refining Company, 36 Wyo. 90, 252 Pac. 1027, a Workmen's Compensation case where the district court disallowed a claimed award and the medical evidence was conflicting, this court said:

"The record discloses that an X-ray picture was taken under the direction of Dr. Kamp. Dr. Lathrop testified that this picture disclosed an injury to the workman's back. Dr. Kamp testified that it disclosed nothing of the kind. Where the physicians could not agree, it is hardly to be expected that this court could decide the dispute between them. It is accordingly clear that there is a hopeless conflict in the testimony on the main points in issue in this case, and it is hardly necessary to say that where there is substantial evidence to support a judgment, as there is in this case, this court will not reverse it. We have already decided that this rule applies to cases under the Workmen's Compensation Act. Standard Oil Co. v. Sullivan, 33 Wyo. 223, 237 Pac. 253. And we have no reason to depart from that ruling."

The claimant has come here with an adverse finding and judgment on a pure question of fact upon which the witnesses disagree. We are unable to see why

the rule announced in the McMahon case, supra, is not applicable here. The rule that where there is substantial evidence to support a judgment—and that is true in this case, we think—this court will not interfere when the evidence is conflicting, should govern the decision in the case at bar. See Cook vs. McDonald, 60 Wyo. 215, 148 Pac. 2d 594, and cases cited.

An elaborate list of cases from our own and other jurisdictions has been submitted on behalf of the claimant dealing with heart conditions somewhat akin to those presented in the case at bar. We have given these decisions careful examination and can not see that they change the result which we are obliged to announce in this matter. Most of them are cases wherein the finding of the trial court or the verdict of the jury was in favor of the claimant and the appellate court affirmed the judgment rendered below. Our case in Re Scrogham, 52 Wyo. 232, 73 Pac. 2d 300 is a good illustration of cases of this character. There the trial court made an award for injuries incurred by the claimant Scrogham in the course of his employment to both eyes. As to the left eye there was substantial evidence to support the award and it was accordingly affirmed. In reversing the judgment of award given for injury to the right eye it was said:

"The record is barren of any testimony indicating just when the hemorrhages in the right eye occurred. For all that appears they may have resulted from work at home, in scuffling with fellow workmen, in walking about on Scrogham's own personal business, or lifting weights in his own home. The medical witnesses all concur in stating that the eye hemorrhages could have been brought about in any of these ways. The burden is on the claimant to show that he has experienced a compensable injury in the right eye before an award may be legally made him for that. In the trial had he did not carry the burden in that respect in this case."

See also White vs. Maverick Production Company, 63 Wyo. 452, 182 Pac. 2d 818.

Some of the cases to which our attention is directed by claimant are from reviewing courts empowered by law to make their own findings upon the record before them as in the State of Michigan, for example, "to make such orders in respect thereto as justice may require". Schroetke vs. Jackson-Church Co., 193 Mich. 616, 160 N. W. 383 where the court refers to the practice in that state and cites their earlier decision of Andrejwski vs. Wolverine Coal Company, 182 Mich. 298, 148 N. W. 684 where the provisions of the law on the point is quoted as above set forth. As all members of the profession in Wyoming know, we are not authorized to try cases anew in this court but only to correct prejudicial errors of law made in the trial courts of the state.

Claimant makes a rather severe attack upon the opinions of expert witnesses as "unreliable" etc., having in mind, evidently, the medical testimony given in the case at bar and 32 C. J. S. 393 and supporting decisions referred to therein is cited. Yet the same text states the rule to be (ibid.) 396, 397:

"The opinions of physicians or medical experts may constitute substantial evidence, sufficient to support a finding, verdict, or judgment, but their credibility, and the weight of their testimony is for the jury or other trier of the facts."

and the text aforesaid as quoted, supplies in the notes thereto a wealth of supporting cases. It appears, of course, in the record before us that both parties availed themselves of medical testimony and we think quite properly so. In dealing with a difficult question of fact as here where technical knowledge is the best human experience can produce in aid of its solution, we hardly think either the district court or this court

is to be regarded as sufficiently learned to resolve the point without aid from those who have given many years of study, training and practice relative to questions of this character. For ourselves, at least, we do not claim to have superior knowledge concerning cardiac pathology.

Mention is made on behalf of claimant that the Workmen's Compensation law should be liberally construed. We have constantly followed this view in disposing of litigation under that law and we still expect to do so. However, we can not disregard principles of appellate practice as announced in the two cases hereinbefore mentioned and hereinbelow referred to which are nationwide in their observance. We may also remark that in the extended and ably written brief for claimant we find many arguments that could very well have been presented to the trial court but on appeal and in the presence of an adverse finding and judgment, do not aid us now. Because we affirm a ruling below made upon sharply conflicting testimony does not necessarily mean that we would have decided the disputed issue of fact similarly with its disposition in the district court if we were trying the case anew. The district court, as we have often indicated, has advantages that we do not have. In that court the testimony comes from the lips of living witnesses; here is comes only from the cold printed record. There is a great difference, as every lawyer of experience is well aware.

All things considered and following the rules announced in Dulaney vs. Jensen and McMahon vs. Midwest Refining Company, supra—and we see no reason for departing from them—our conclusion must be that the judgment of non-award of the district court of Laramie County should be affirmed and it will be so ordered.

*Affirmed.*

BLUME, J. and KIMBALL, J. concur.