In the Matter of the Application of Pacific Power & Light Company for a certificate of public convenience and necessity, Wyoming Public Service Commission Docket No. 9408; and In the Matter of the Application of Big Horn Rural Electric Company for an order further amending its basic certificate of public convenience and necessity in Docket No. 9041, Wyoming Public Service Commission Docket No. 9041 sub. 6.

BIG HORN RURAL ELECTRIC COMPANY, Appellant (Appellant below),

v.

PACIFIC POWER & LIGHT COMPANY, Appellee (Respondent below).

No. 3250.

Supreme Court of Wyoming.

Dec. 17, 1964.

James A. Zaring, Basin, for appellant.

Richard E. Day, Sp. Asst. Atty. Gen., Cheyenne, for Wyoming Public Service Commission.

Houston G. Williams, Casper, for appellee.

Before HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice GRAY delivered the opinion of the court.

This is an appeal by Big Horn Rural Electric Company from a judgment entered by the District Court of Laramie County, Wyoming, confirming an order of the Public Service Commission of Wyoming granting to Pacific Power & Light Company a certificate of public convenience and necessity authorizing it to furnish, as a public utility, electrical service in an area embracing some 255 square miles located in the northeastern part of Big Horn County, Wyoming.

The record reveals that the area is bordered on the north by the Wyoming-Montana boundary line; on the east by the Big Horn-Sheridan county line; and on the south and the west by service areas certificated to Pacific and Big Horn, either jointly or severally. Although both companies had been operating in their authorized service areas for some time, neither—with one unimportant exception—had requested authority from the commission to extend facilities into the uncertificated area here involved. No doubt that is best explained by the evidence which indicates that for the most part the terrain of the area is rough and mountainous. It is virtually uninhabited. Prior to the fortuitous circumstance which initiated the controversy here, the only potential electrical customers in the area were the owners of a number of

mountain cabins; a television microwave tower; a ski tow, with related facilities; and a ranger station. It seems to have been understood by all concerned, including the commission, that an extension of facilities to serve only those customers was not economically justified.

However, the circumstance mentioned which apparently made the area attractive to both companies as a service area was the contemplated construction and installation therein of a radar navigation facility by the Federal Aviation Agency on the peak of a mountain known as "Medicine Wheel," which has an elevation of approximately 10,000 feet. To operate the facility it was necessary to have a firm source of electrical power, and to that end the agency outlined its needs to each company, with the request that consideration be given to the practicability of extending its facilities into the area for the primary purpose of furnishing such power. It was also established that unless commercial power could be furnished upon terms satisfactory to the agency, it would provide its own power.

In keeping with the request, both Pacific and Big Horn made preliminary studies of the area. Apparently concluding that the proposed project was practical and in the public interest, each company filed an application with the commission for a certificate of public convenience and necessity, requesting the exclusive right to extend its facilities into the area. The obtaining of such a certificate is a prerequisite to the commencement of construction. Section 37-31, W.S.1957.

In the joint hearing of the applications by the commission, Pacific proposed that it would construct a 34.5 kv line into the area, commencing at a point near the Lovell substation and terminating near the radar site, a distance of approximately twenty-four miles. The estimated cost of the line was $150,000. Big Horn proposed to serve the area by extending a recently constructed 12.5 kv line from a point near Kane, Wyoming, to the radar site, a distance of approximately fifteen miles. The

estimated cost of such extension was $49,-300. While there were other matters to be determined by the commission, special mention is made here of the service facilities proposed for the reason that the factual issue of which proposal would best serve public convenience and necessity is, as we view it, the critical question in determining whether or not the commission erred in its ultimate conclusion that the application of Pacific should be granted and that of Big Horn denied.

As an initial approach to review of the matter, and taking into consideration the whole of the record stripped of unimportant formalities, the nature of the proceeding was simply to call upon the commission to exercise its jurisdiction and to determine for the State, on a comparative basis, which of the two applicants should be awarded the right to extend facilities into an area concededly having need for electrical service.

■ The authority of the commission in the premises is contained in § 37-31, W.S. 1957, which provides in part:

"No public utility shall henceforth begin the construction of a line, plant or system, or of any extension of such line, plant or system, without having first obtained from the commission, a certificate that the present or future public convenience and necessity require or will require such construction; * * *."

It will be noticed that "present or future public convenience and necessity" is the "touchstone" for the exercise of the power. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656. To state it another way, the public interest is to be given paramount consideration; the desires of the utilities are secondary. Public Service Company v. Public Utilities Commission, 142 Colo. 135, 350 P.2d 543, 549, 558, certiorari denied Union Rural Electric Association, Inc. v. Public Service Company of Colorado, 364 U.S. 820, 81 S. Ct. 53, 5 L.Ed.2d 50; Application of Trans-

Northwest Gas, 72 Idaho 215, 238 P.2d 1141, 1144; Kansas Gas & Electric Co. v. Public Service Commission of Kansas, 122 Kan. 462, 251 P. 1097, 1099. The discretion vested in the commission by the statute is broad indeed when, as here, no vested rights are involved. San Diego & Coronado Ferry Co. v. Railroad Commission of California, 210 Cal. 504, 292 P. 640, 643; Kansas Gas & Electric Co. v. Public Service Commission of Kansas, supra; 3 Pond, Public Utilities, § 913, p. 1849 (4th Ed.). The statutory standards to be observed are as stated in § 37–31(b), that the commission "after hearing involving the financial ability and good faith of the applicant and the necessity of additional service" in the area, may grant, deny, or condition the certificate. No doubt we should here state that insofar as those standards are concerned, we are convinced that the commission applied the standards and was warranted in finding, as we think it did find, that either application withstood those tests. Big Horn does not seriously dispute this.

However, the commission for its guidance and for the guidance of persons interested in such matters has laid down what we might term as subsidiary issues that are to be considered in reaching a decision on the ultimate issue of public convenience and necessity. The order states these to be:

"In deciding which one of the Applicants herein is best fitted to serve this Area, many factors developed by the record herein must be carefully considered, i. e., the qualifications and fitness of the Applicants, the source and adequacy of their power supply, the proximity of their existing service facilities to the prospective loads in the Area, the nature of such loads, the immediate and long term electric requirements of the Area, the type of facilities each of the Applicants propose to construct, the topography and rigorous climate of the Area, and, above all, the overriding public interest."

It is against these pronouncements that Big Horn levels its attack. In its petition on appeal it recites some seventeen claimed transgressions on the part of the commission in considering these factors. Several of these we regard as inconsequential. Others have already been answered in the discussion on statutory standards. Still others go to the weight that should have been given to the showing made by Big Horn on the several elements. While we can agree that these matters are important, we know of no rule of law, and we are cited to none, that prescribes the weight that must be accorded to each element. That, it seems to us, was for the commission to decide. Of course, a different question is presented if on the record there is a showing of arbitrary, unreasonable, or capricious action on the part of the commission. It is for these reasons that we revert to the critical question of the proposed facilities, which as we have indicated appears to have been the determinative factor so far as the commission was concerned.

The commission, in this regard, said in part:

"* * * The record indicates that 12 KV is the minimum voltage acceptable for electric service at this radar installation; and that the voltage factor thereat must be maintained at a rigid constancy, as no safety factor will be built into radar equipment itself. It was further emphasized by Witness Harvey that spasmodic power fluctuations could cause extensive harm to the standby and radar equipment, and thus result in an equipment failure effectuating a dangerous gap in the FAA radar net. The evidence further indicates the critical nature of the radar load requires a larger voltage than the minimum requirement in order to provide a more firm and stable and, consequently, a more desirable basis for service. Expert testimony given in the proceeding indicates that a heavy pumping load on a 12 KV line

serving the radar station, would interfere with the required critical voltage constancy to such a degree as to render the service insufficient and unfeasible. * * *

" * * * The evidence shows that the territory which must be traversed by a power line constructed to serve the Area, may best be described as rough, rugged, mountainous terrain interlaced with ravines and gullys [sic]; a country of considerable snow and high winds. The record reveals that a high voltage power line of heavy and substantial construction would more aptly withstand the rigors of the elements in this steep wind swept mountainous territory.

* * * * * *

"Considering all of the evidence relating to service within this Area, the determinative factors above enumerated, the safety of aircraft, and indeed the welfare of the nation as a whole, we find that the paramount and controlling issues for us to determine with respect to this Area are (1) which one of the proposed lines of the Applicants will more adequately meet the overall requirements of the public at large; and (2) which one of the Applicants has a more adequate and stable supply of power available to it to meet the long term electric requirements of the Area. Upon the evidence of record, we conclude that these issues must be decided in favor of Pacific. We, therefore, find that the overriding public interest requires that this Area should be served by Pacific from its more substantial and higher voltage transmission line; * * *".

Big Horn argues that the foregoing is not supported by any substantial evidence.

■ For purposes of disposing of this contention, we think it unnecessary to set forth the evidence in any great detail. In fact, the recitals of the order in the first full paragraph above were, in essence, a digest of the testimony of Mr. D. M. Har-

vey, the regional electrical engineer for the agency seeking the service. The fact that the agency then represented that it would not accept a lower voltage than 12,000 volts might have been added to the recitals. Such evidence was sufficient to support the implied finding of the commission that a 12 kv line, without a heavy pumping load, was a minimum requirement. Notwithstanding, Big Horn argues that its proposal of a 12.5 kv line was conclusively shown to be adequate, particularly in view of the lack of evidence showing a heavy pumping load. This argument overlooks an important facet in the case. By the statute the commission was admonished to consider not only "present" convenience and necessity but also "future" convenience and necessity. Granted, there was no direct evidence of an existing heavy pumping load. Nevertheless, there was evidence from which the commission could infer a lack of adequacy in the facility. As pointed out above, there were other potential users in the area, even though their specific requirements had not been established. There was evidence also that Big Horn would utilize a recently constructed 12.5 kv "tie line" some twelve miles in length as a part of its transmission facilities. While it was not shown at the time of hearing that there were customers on this line, Big Horn's engineer, Mr. Kermit Hanson, testified that even prior to the prospect of acquiring the load of the radar station, Big Horn "justified the line and felt we had a need for it." To justify the line would be to project a load commensurate with its cost. Absent some explanation, we think the commission was entitled to draw an inference that such load would unduly "interfere with the required critical voltage constancy" of the radar station.

■■ Further than this, there was conflict in the expert testimony on the subject. The witness Hanson gave it as his opinion that the facilities proposed by Big Horn had adequate capacity to serve the radar load and the mountain cabins in the area. Conversely, Mr. C. R. Leever, division engineer for Pacific, testified that in his

opinion Big Horn would probably encounter difficulty meeting voltage requirements unless it went to a standard voltage of 24.9 kv. While the opinion of the witness Leever is criticized as stating no more than a "probability," we think the record is to the contrary. The witness was not cross-examined on his opinion and there is other evidence of the grounds for his belief. Pacific previously had constructed a 13.8 kv line, some sixteen miles in length, to serve an identical radar station near Rock Springs, Wyoming. No difficulty was encountered on the line in meeting agency requirements. When asked why the proposal here was for a 34.5 kv line, he stated one reason to be that it would be some nine miles longer; and, in estimating required capacity, the rule of thumb, although not exact, was "a thousand volts to the mile." On that state of the record it seems clear that his opinion was the result of his "considered belief and judgment" based upon his training and experience. Under the circumstances, we cannot say that the commission erred in giving some weight to the opinion, which it apparently did. Rocky Mountain Trucking Company v. Taylor, 79 Wyo. 461, 335 P.2d 448, 452. It was for the commission to resolve the conflict. Corey v. B. D. Pennington Co., 65 Wyo. 301, 200 P.2d 333, 339. Furthermore, that rule is particularly appropriate here because the subject matter is technical, calls for aid of the experts, and the opinions are weighed and considered by a tribunal experienced in such matters.

For the reasons stated we find no merit in Big Horn's contention that there was no substantial evidence to support the conclusion of the commission that the facilities and service proposed by Big Horn were "insufficient and unfeasible."

Having thus disposed of that aspect of the contention, we turn to the claimed lack of support in the evidence for the commission's conclusion that Pacific's proposed facilities would more adequately meet "overall requirements of the public at large." In this we would agree with Big Horn that there was slight evidence to support some of the reasons which the commission assigned for reaching its conclusion. Nevertheless, there can be little doubt as to the adequacy of the facilities to meet load requirements of the area. Such evidence is uncontroverted, and Big Horn presents a rather forceful argument that the construction costs of Pacific's proposed facilities were not fully justified for the reason that there was evidence from which it could have been found that the capacity of the facilities was substantially in excess of actual requirements. There was also little dispute in the evidence concerning adversities to be met from the terrain and the climatic conditions. There was testimony that two or three methods of construction could be utilized to meet these adversities, and Pacific assured the commission that a proper method would be selected after a more extensive survey. Under those circumstances, and having in mind that there is always some uncertainty in projecting proposals into the future, as the commission is required to do in the light of its experience, we cannot say that the conclusion of the commission with respect to Pacific's proposed facilities was entirely without evidentiary support.

Aside from the foregoing, Big Horn argues that the order of the commission was the result of arbitrary and capricious action. The argument is primarily advanced on the basis that the commission ignored the evidence which disclosed that the cost of Pacific's proposed facilities was approximately triple the cost of Big Horn's proposed facilities. It is also argued that the commission ignored its own standard in considering the evidence relating to the proximity of existing facilities to the prospective loads. In this regard it must be remembered that our review is limited. We have said several times that it is not the function of the courts to try the controversy anew and that the courts will not substitute their judgment and discretion for that of the commission unless abuse is shown or, as sometimes stated, unless there

is a showing of capricious, unreasonable, or arbitrary action. Svilar Light and Power, Inc. v. Riverton Valley Electric Association, Inc., Wyo., 355 P.2d 52, 55; Natural Gas Consumers of Rock Springs v. Northern Utilities Co. of Casper, 70 Wyo. 225, 247 P.2d 767, 782, 783; Gore v. John, 61 Wyo. 246, 157 P.2d 552, 562. When the record is so viewed, we cannot say that the commission was arbitrary in selecting the more substantial facilities. As pointed out, there was evidence that Big Horn's proposed facilities were inadequate. There was also Big Horn's refusal to increase the capacity of the line over that proposed. Conversely, there was uncontroverted evidence that Pacific's proposed facilities were entirely adequate; and even though some excess was indicated, the extent and cost thereof beyond reasonable requirements for the area were not shown. Furthermore, such element is directly related to the matter of rates and charges for the service. In these matters the commission has continuing jurisdiction, and if it should develop that the rates proposed are unjust and unreasonable, as a result of excess capacity, the matter can be adjusted without too much difficulty in a proper proceeding before the commission.

The argument that Big Horn was entitled to the certificate because its "tie line" facility was some ten miles closer than Pacific's existing source of power overlooks the commission's finding of insufficient capacity in the facility.

Following the decision of the trial court confirming the order of the commission, Big Horn filed a motion for new trial on the ground of newly discovered evidence, contending that such evidence was sufficient to show fraud in the proceeding before the commission. The motion was denied, and in this Big Horn claims error on the part of the trial court.

From the affidavits offered in support of and in resistance to the motion it appears that subsequent to the order of the commission Pacific entered into a contract with the Federal Aviation Agency in which Pacific and the agency agreed on the terms and conditions under which the agency was to be furnished electrical service. The contract specified that Pacific was to construct a 34.5 kv line from its Lovell substation to a point on Medicine Wheel Mountain, a distance of some twenty-one miles. At that point it was to install a substation stepping down the voltage to 4,160 volts and construct a line carrying that voltage to the site of the radar station, a distance of 3.7 miles. That was done and service to the agency has now been furnished for several months. It is stated in the affidavits of Mr. J. L. Satterfield and Mr. C. R. Leever, which are uncontroverted, that the change in construction of the facilities as proposed at the time of hearing was made to comply with an objection by the Forest Service to the laying of underground cable over the last few miles to the radar station.

The argument of Big Horn that the foregoing developments subsequent to the hearing and order of the commission establish improprieties in the commission proceedings as a matter of law is premised on the variance in the specifications of the facilities as actually constructed and the specifications presented to and acted upon by the commission. We find no merit in this contention.

In the first instance, the only question before the trial court at the time this matter was brought to its attention was whether or not, under the appeal statute, there was a sufficient showing of "fraud or misconduct of some person engaged in the administration of the law affecting the order." Section 37–45, W.S. 1957. The burden was on Big Horn to prove it by clear and convincing evidence. When the showing made is reviewed on that basis it seems clear that the trial court was entirely warranted in holding that Big Horn had not met its burden.

The parties and the commission understood that the culmination of the undertaking was dependent upon the ability of either applicant to negotiate a contract

with the agency after the certificate had been granted. Further than this the agency in the commission hearing declined to state all of the terms upon which it would negotiate. So far as we can ascertain, all that the applicants knew of those terms and all that the commission knew was that the agency would require a minimum voltage delivery at the radar site of 12 kv. Both applicants and the commission proceeded upon that basis, and as heretofore indicated there was support in the record for the commission's determination that the facilities proposed by Pacific were best suited to meet all of the present and future demands of the area. Thus a showing, without more, that subsequent to the effective date of the order some modification was made in the specifications of the facilities for the last 3.7 miles of the line by agreement of the agency and Pacific can hardly be said to be proof of fraud.

That is particularly true in view of the uncontradicted showing that the modifications were prompted by objections from the Forest Service to the original plans.

Neither does the fact that the commission informally acquiesced in the modifications disclose intentional wrongdoing on the part of members of the commission. According to the record the commission was not advised of the modifications until its order had been in effect for almost one year. By that time the facilities were constructed; satisfactory service was being rendered; and the trial court had heard the matter on appeal. Such informality at that stage of the proceedings and under those circumstances is hardly tantamount to misconduct.

In final analysis, disposition of the motion was within the sound exercise of discretion by the trial court, and we have not been shown wherein that discretion has been abused. Rim Group v. Mountain Mesa Uranium Corporation, 78 Wyo. 204, 321 P.2d 229, 231, rehearing denied 78 Wyo. 213, 323 P.2d 939.

In this connection, we think it appropriate to mention that the circumstances above described, occurring subsequent to the commission order, have caused us concern in entertaining review of this proceeding upon the merits. Big Horn must be charged with knowledge of the provisions of § 37–39, W.S.1957, fixing thirty days after service as an effective date for orders of the commission. Notwithstanding, no effort was made to stay the order through available remedies. Hence the changed circumstances. Just what effect that might have on the authority of the courts or the commission now to fashion any relief which would be of practical benefit to Big Horn is not readily apparent. Possibly the case is moot. Welch v. Town of Afton, 64 Wyo. 49, 184 P.2d 593, 594; State ex rel. Schwartz v. Jones, 61 Wyo. 350, 157 P.2d 993, 994–995. However, inasmuch as the point was not raised in the trial court we have refrained from disposing of the appeal on that narrow ground.

Judgment affirmed.

Mr. Chief Justice PARKER, not participating.